UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

Charlottesville Division

STEVEN ROSENFIELD, *et al.*,  )
                              )
    Plaintiffs,           )
                              )
v.                            ) C.A. #3:05-cv-00072
                              )
HONORABLE WILLIAM W. WILKINS,  )
                              )
    Defendant.            )

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR RECUSAL

### Introduction

Plaintiffs Steven Rosenfield and Edward M. Wayland have filed a motion asking that the Hon. James B. Loken, Chief Judge of the Court of Appeals for the Eighth Circuit, recuse himself from participation in this case pursuant to 28 U.S.C. Sec. 455(a) on the grounds that his impartiality "might reasonably be questioned."

The plaintiffs do not contend that Judge Loken is biased in this matter. They state, however, with all due respect, that because of his duties as Chief Judge of the Eighth Circuit, Judge Loken is personally involved in policy-making and administrative practices relating to the payment of fees to attorneys under the Criminal Justice Act (CJA), 18 U.S.C. §§3006A, 3599,[1] which directly involve the same issues as those challenged in the present action. If he were to

---

[1] At the time the original Complaint in this action was filed, provisions of the CJA dealing with the appointment of attorneys in cases involving the death penalty were codified at 21 U.S.C. §848(q)(4)-(10). Effective March 9, 2006, those provisions were re-codified, essentially unchanged, at 28 U.S.C. §3599, by §222(a) of the USA PATRIOT Improvement and Reauthorization Act of 2005, P.L. 109-177, 120 Stat. 231.

serve as judge of the present action, he would be called, in effect, to review the validity of his own administrative actions and practices. Indeed, because of his personal involvement in these practices, Judge Loken is himself a potential defendant if an action identical to the present action were filed in a district court in the Eighth Circuit. For these reasons, Judge Loken should not sit in judgment of this case.

Factual and Procedural Background

This case challenges the procedures used by the United States Court of Appeals for the Fourth Circuit to award fees to counsel appointed under the Criminal Justice Act (CJA), 18 U.S.C. §§3006A, 3599. Specifically, the plaintiffs challenge that court's procedures of paying fees that are less than the amounts certified by appointed attorneys as due for work they have completed in CJA cases without written standards, without explanation, and without offering the affected attorneys any opportunity to be heard. The defendant named in this action is the Hon. William W. Wilkins, Chief Judge of the Fourth Circuit, who has the administrative responsibility of seeing that the CJA procedures for that court are properly set up and implemented.

The named plaintiff attorneys, acting under a CJA appointment from the Fourth Circuit, represented Bobby Swisher, an indigent defendant under sentence of death, in presenting claims for federal *habeas corpus* relief.[2] Among other things, they argued that in *Powell v. Commonwealth*, 261 Va. 512 (2001), the Virginia Supreme Court had ruled that jury verdict form used for sentencing at Mr. Swisher's trial contained inaccurate and misleading information which

---

[2] Mr. Rosenfield was appointed by the Fourth Circuit from its CJA panel. Mr. Wayland was Mr. Rosenfield's law partner at the time and assisted him on this case. Under the Fourth Circuit's CJA Plan, Mr. Wayland is also entitled to compensation for his work.

could lead a jury to believe that it was required to impose a death sentence when in fact it was not. Unfortunately, they were precluded from asking the Supreme Court to intervene because this issue had not been raised prior to the ruling in *Powell*. Recognizing the problems involved in executing a man based on a process which had been declared unfair and in violation of his rights by his own state's Supreme Court, the Governor of Virginia granted a temporary stay of execution to permit counsel to return to the Virginia Supreme Court to ask that court one more time to intervene. Citing procedural obstacles to considering the defendant's claims, however, the Virginia Supreme Court again declined to intervene. Shortly thereafter, the defendant was executed.

Following the conclusion of this case, the plaintiff attorneys submitted a timely and detailed CJA voucher to the Court of Appeals, seeking fees of $38,393.75. Judge Wilkins, acting in his administrative capacity as Chief Judge, awarded the plaintiffs $10,000.00. This amounted to a reduction of approximately 74% from the requested amount. Judge Wilkins offered no explanation for this reduction or for the manner in which he calculated the fee of $10,000.00. Nor were there any published criteria, standards, guidelines or policies for him to use in evaluating the plaintiff attorneys' time records to determine the appropriate amount of the fee which should be paid. Finally, there was no process available to the plaintiff attorneys to be heard to question this reduction.

The plaintiff lawyers filed their complaint in this action *pro se* on December 12, 2005[3] in the United States District Court for the Western District of Virginia. It was assigned to District Judge Norman K. Moon. By order entered February 13, 2006, Judge Moon recused himself *sua*

---

[3] An amended complaint was filed on March 15, 2006.

*sponte*, deeming it inappropriate to sit in judgment of the contested action of the chief judge of the appellate court having jurisdiction over his decisions. The plaintiff lawyers were advised by court personnel that a judge from outside the circuit would be sought for the case. In August, 2006, newly-entered counsel for the plaintiff lawyers learned that the case had been assigned to the Honor James B. Loken, Chief Judge of the Eighth Circuit.

For the reasons stated in their Motion and in this Memorandum, the plaintiffs respectfully ask Judge Loken to recuse himself from participation in this matter, on the grounds that his personal involvement with the creation and implementation of the polices and procedures of the CJA mean that his impartiality "might reasonably be questioned." 28 U.S.C. §455(a).

    I.    Background: The Criminal Justice Act, Attorney's
           Fees And The Role of The Chief Judges of The Circuits

The Sixth Amendment to the Constitution of the United States requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." As the Supreme Court said in *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963), "[I]in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth." *Accord, United States v. Cronic*, 466 U.S. 648, 653 (1985) ("lawyers in criminal cases are necessities, not luxuries").

To carry out the mandate of the Sixth Amendment, the CJA authorizes federal courts to appoint attorneys to represent defendants who are financially unable to hire their own defense counsel. 18 U.S.C. §§3006A, 3599. The CJA provides for an administrative system within each

judicial district under the supervision of the judicial council of the circuit. Under this system, panels of skilled criminal defense attorneys are formed from which attorneys are selected for appointment by the district and circuit courts to represent indigent federal criminal defendants. Among other things, the CJA addresses the manner of appointment of counsel, the duties of appointed counsel, and the amount of payment to be made to the attorneys for their services.

According to a study published by the Vera Institute of Justice (hereafter referred to as "the Vera Study"),[4] each year, approximately 9,000 criminal cases are appealed to federal courts of appeals by defendants who qualify for appointed counsel under the CJA. Many of these defendants are represented by federal public defender offices. But approximately one-half are represented by private practitioners acting as court-appointed counsel. *Id.* at 1.

The chief judges of the circuit courts of appeals play a central administrative role in making and implementing the policies of the CJA. This group includes both the defendant in this action, Chief Judge Wilkins of the Fourth Circuit, and the person who has been designated to sit as judge, the Chief Judge Loken of the Eighth Circuit. The chief judges of the circuits are all members of the Judicial Conference of the United States, 28 U.S.C. §331(a), which exercises general administrative oversight over the CJA system.[5] The Judicial Conference plays a key role

---

[4] Jon Wool and Claire Shubek, "Good Practices for Panel Attorney Programs in the U.S. Courts of Appeals,", Vera Institute of Justice (January 2006). This study of practices and problems in the administration of the CJA by the circuit courts of appeals, which included interviews with circuit court judges and CJA panel attorneys, was undertaken under a contract with the Administrative Office of the U.S. Courts. Relevant portions of the Vera Study are remitted in a documentary appendix filed herewith as Exhibit A.

[5] It is counsel's understanding that the Judicial Conference has a number of committees which help devise policies for the judiciary, and that among those committees is one that recommends policies governing the award of fees to court-appointed counsel. Committee assignments and committee work product are not public information, and so counsel do not know and cannot find out whether Judge Wilkins and Judge Loken sit on any committees together or have worked

in making policy decisions involving the operation of the CJA by the courts. It reviews and approves detailed guidelines governing CJA administration by the federal courts, which have been published as *Guidelines for the Administration of the Criminal Justice Act and Related Statutes*. In addition, the Judicial Conference is specifically authorized by Congress to review the fees payable to CJA attorneys and to raise the fee cap if appropriate. Acting under this authority, the Judicial Conference has, in fact, raised the hourly fee several times.

The chief judges of the circuits also play a central role in the administration of the CJA in their circuits. The CJA plan adopted by each federal district is to be reviewed and approved by the judicial council of the circuit. 18 U.S.C. §3006A(a). The judicial council is a body made up of representative district and circuit court judges. The chief judge of the circuit is, by statute, a member of the judicial council of the circuit. 28 U.S.C. §332(a)(1). The chief judge is the presiding officer and the person designated to call judicial council meetings.

Finally, the chief judges of the circuits have significant responsibilities regarding the review of individual payment vouchers submitted by CJA attorneys seeking payment of fees and expenses. Under 18 U.S.C. §§3006A(d)(3) and 3599(g)(2), the approval of the chief judge of the circuit is required for payment of fees in excess of the payment caps set by the CJA. And often the chief judge is responsible for reviewing and approving all fee petitions submitted by CJA attorneys for work in the circuit court.[6]

---

together on the issue of CJA fees as part of their duties as member of the Judicial Conference. If Judge Loken, as a Judicial Conference member, has participated in the formation of policies with the defendant on at least some of the issues before the court in this action, this would be all the more reason for his recusal here.

[6] Vera Study at 25, n. 27: "Included among the compensation-related matters that courts of appeals routinely handle are the review by the chief judge (or that judge's delegate) of all appellate court CJA vouchers submitted by attorneys or other service providers and district court vouchers claiming amounts that exceed the statutory case compensation maximums."

Thus, the chief judge of the circuit has significant policy, administrative and oversight responsibilities relating to the operation of the CJA.[7] These responsibilities include a number of tasks specifically related to the fees which CJA attorneys receive, including determining the amount of fees which are permitted, the process attorneys must follow to be paid, and the process the courts and their staffs must follow to evaluate attorney vouchers and approve levels of payment. These are all issues directly relevant to the present matter.

These are also issues which are extremely significant for the operation of the CJA program and for the quality of representation indigent defendants will receive. The Vera Study, found, at 25-26, that,

> A large number of those we interviewed -- primarily attorneys but also judges and administrators -- expressed concerns about the efficiency, consistency and fairness of the attorney compensation review in the courts of appeals. . . . Concerns about consistency focus on the variations in compensation determinations from circuit to circuit and from judge to judge within a circuit. Concerns about fairness address whether an attorney has notice of, and an opportunity to respond to, voucher reductions, the clarity of the local rules guiding compensation decisions, and the timeliness with which vouchers are processed. Both consistency and fairness concerns affect the inclination of panel attorneys to accept appellate assignments and, ultimately, on the quality of panel attorney representation.

Congress has specifically provided that private attorneys appointed to represent indigent defendants under the CJA should be compensated for time "reasonably expended" on appointed cases, 18 U.S.C. §3006A(d)(1), and that the compensation should be sufficient to ensure that

---

[7] This fact was recognized by District Judge Norman K. Moon, in his Opinion and Order entered February 13, 2006, recusing himself from presiding in the present action. Finding that the plaintiffs had acted in good faith by naming Chief Judge Wilkins as the defendant in this action, Judge Moon stated that "Chief Judge Wilkins is likely the sole individual whose administrative duties and authority would enable him to implement the relief Plaintiffs seek, and was thus the only sensible defendant to name." Opinion and order at 4.

"qualified attorneys be encouraged to represent financially eligible defendants." H.R. Rep. No. 99-417 at 4 (1985). Under 28 U.S.C. §§3006A(d)(1) and 3599(g)(1), Congress set maximum hourly fees that attorneys could be paid, but then authorized the Judicial Conference, which includes the chief judges of the twelve federal circuits, to increase those fees if the members deemed it appropriate. Currently, as a result of increases approved by the Judicial Conference, the maximum fee an attorney may receive for work in a non-death penalty case is $92 per hour, and the maximum fee which may be paid in a death penalty case is $163 per hour.

The CJA also caps the total fee which an attorney can receive in non-death penalty cases. An attorney appointed to work on such a case may be paid a total of no more than $7,000 for work in the district court and $5,000 for work in the court of appeals. If the case involves "extended or complex litigation," fees can be awarded in excess of these caps if doing so is necessary to provide "fair compensation," but only with the approval of the chief judge of the circuit. §3006A(d)(3). There is no cap set by the CJA for work done on a death penalty case.

Even after the increases approved by the Judicial Conference, the hourly rates and per-case ceilings are well below market rates. As the Vera Study notes, "...the hourly compensation rates for appointed counsel historically have been, and continue to be, low...." *Id* at 28. These low payment limits can create serious problems for the attorneys who do this work. Such attorneys are often highly skilled, dedicated practitioners, devoting their time and talents to make the system work. Yet the limited compensation available to them can create significant problems for them as they struggle to provide this important public service while making ends meet financially in their businesses. *See*, Declaration of Steven Rosenfield, Exhibit B.

A subcommittee of the Judicial Conference has recognized the significance of the issue of the level of compensation of court-appointed attorneys in death penalty cases. That subcommittee's report states:

> . . . appropriate rates of compensation are essential to maintaining the quality of representation required in a federal capital case. The time demands of these cases are such that a single federal death penalty representation is likely to become, for a substantial period of time, counsel's exclusive or nearly exclusive professional commitment.[8]

The American Bar Association has criticized the compensation provided to court-appointed attorneys representing defendants in death-penalty cases. According to Robin M. Maher, Director of the ABA Death Penalty Representation Project since 2001,

> It is clear that attorneys without adequate compensation and resources cannot take on the burden of representing a death row client in post-conviction proceedings. The ABA recognized this fact in its revised edition of "Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases," approved in February 2003: "[i]t is demonstrably the case that, by discouraging more experienced criminal defense lawyers from accepting appointments in capital cases, inadequate compensation has often left capital defense representation to inexperienced or outright incompetent counsel."

Declaration of Robin M. Maher, submitted as Exhibit D to this Memorandum.

The Vera Study, which was based on interviews with both judges and lawyers, confirmed the importance of compensation issues in achieving the CJA purposes of insuring high quality legal services for indigent defendants. As one attorney quoted in that study observes: "There is no underestimating the importance of payment and how it attracts or deters quality attorneys."

---

[8] *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, Part II of a report prepared by the Subcommittee on Federal Death Penalty Cases of the Judicial Conference's Defender Services Committee. This report was published as Appendix I of the Judicial Conference's Guidelines for the Administration of the Criminal Justice Act and Related Statues. An excerpt is remitted as Exhibit C.

Vera Study at 28. Unexplained decisions to pay attorneys less than the amounts they requested have compounded the problems presented by the low payment levels. The Vera Study noted, *id.*, that "a number of judges made a similar point. 'Panel quality depends on attorneys feelin they will be treated fairly,' remarked one, 'and compensation issues are part of that.'"

The Vera Study included a recommendation addressed specifically at fairness issues involved in attorney compensation:

> Attorneys should be notified of proposed voucher reductions and the reasons for them, and should be provided with an opportunity to explain why reconsideration is important.

Vera Study, "Executive Summary."

The present action challenges, on constitutional grounds, the failure of one circuit court to have in place procedures such as those recommended by the Vera Study. As the discussion above indicates, these are extremely serious issues which directly affect the success of the CJA program and the quality of representation received by indigent criminal defendants in the federal system. It is critical that issues of such importance be decided by a judge whose impartiality cannot be reasonably questioned, *i.e.*, a judge without prior involvement in establishing or implementing the CJA policies. This is what the law requires.

II. <u>The Appropriateness of Recusal</u>

A. <u>The Standard</u>

As previously noted, there is no claim of actual bias here. 28 U.S.C. §455(a) provides for disqualification of a judge where a judge's impartiality "might reasonably be questioned." This section codifies the recognition that "the goal of the judicial disqualification statute is to foster

the appearance of impartiality." *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980).

> The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his impartiality on the basis of all the circumstances.

*Aiken County v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 679 (4th Cir. 1989); *Rice v. McKenzie*, 581 F.2d 1114, 1116 (4th Cir.1978). The Fourth Circuit's formulation of the applicable standard is conventional. "Any question of a judge's impartiality threatens the purity of the judicial process and its institutions." *Potashnick*, 609 F.2d at 1111. The judiciary's understandable overriding concern with appearances dictates that disqualification should follow "if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Id.*

### B. Judge Loken Should Not Sit in Judgment of Policies Which He Helped Enact or of Actions Similar to Those He has Taken.

*United States v. Wright*, 873 F.2d 437, 445 (1st Cir. 1989), addressed the recusal of judge who had acted in an administrative or quasi-legislative capacity, similar to what judges do when awarding fees under the Criminal Justice Act. Then-judge Breyer, a member of the commission which had devised the newly promulgated sentencing guidelines, considered whether he had to recuse himself from the appeal of a sentence given under the guidelines. He declined expressly because the case did not challenge the guidelines but rather the district judge's application thereof. In language directly applicable here, Judge Breyer noted that a "substantial

challenge" made "against the existence of the Guidelines system and hence of the Sentencing Commission itself" would have warranted recusal. *Id.* at 445.

The instant case warrants recusal under Judge Breyer's cogent formulation. First, as noted above, Judge Loken, in his capacity as Chief Judge of the Eighth Circuit, has been directly involved with both the formulation of CJA policies, including policies relating to fees, and with the award of fees to specific litigants. In fact, the same constitutional problems which the plaintiff lawyers have alleged are problems with the process used in the Fourth Circuit appear to be present in the Eighth Circuit as well.

The Declaration of John Wesley Hall is submitted as exhibit E to this memorandum. Mr. Hall has practiced criminal defense law in Arkansas and in the courts of the Eighth Circuit for over 30 years. Hall Declaration, ¶1. He has handled approximately 80 appellate arguments before the Eighth Circuit. Id., ¶2. Among other things, he serves as First Vice-President of the National Association of Criminal Defense Lawyers, a national organization with over 13,000 members. *Id.*, ¶3. He is on the CJA panel for his district and handles both capital and non-capital cases. *Id.*, ¶4. He estimates that he has handled over 250 jury trials and about 800 bench trials during the course of his career. *Id.*, ¶5.

Mr. Hall reports that he and his colleagues share the understanding that Judge Loken reviews all CJA fee petitions submitted to his court. *Id.*, ¶8. Mr. Hall gives an example of a case in which he was awarded approximately 50% of his requested fee, without explanation, standards or the opportunity to have the award reviewed. *Id.*, ¶¶6-11 and accompanying documents.

There can be no question that the process described by Mr. Hall, and which he states is typical of the experience of CJA attorneys practicing in the Eighth Circuit, *Id.*, ¶10, is in all material respects identical to the process complained of in the present action. Further, it is Mr. Hall's testimony that Judge Loken is the person who administered these policies in his case and who administers them generally on behalf of the Eighth Circuit. *Id.*

The Eighth Circuit's current *Plan to Implement the Criminal Justice Act of 1964* is submitted with this memorandum as Exhibit F. It provides powerful support to Mr. Hall's testimony. Like the Fourth Circuit's plan, the Eighth Circuit's includes no standards, criteria, guidelines or policies governing the determination of fees for work before the court of appeals. It does not require that attorneys be advised of the reasons for any reductions in the fees they receive. And it does not provide for any appeal or review of an adverse decision. This plan, therefore, suffers from the identical problems which the plaintiff attorneys have alleged render the Fourth Circuit's plan unconstitutional.

. . . . If Judge Loken were to rule on the merits of the instant case, it would amount to a ruling on the constitutionality of his own previous actions and practices and on the constitutionality of his own court's administrative policies. If a case similar to the present one were brought in a district court in the Eighth Circuit, then Judge Loken would, as Judge Moon said of Judge Wilkins, be "the only sensible defendant."[9] The plaintiff lawyers respectfully submit that the recusal statute exists to insure that such a situation not arise.

---

[9] See n. 7 at 7, *supra.*

. . . . Courts have recognized on numerous occasions that a judge should not pass on the propriety of their own acts. In *Rice v. McKenzie*, 581 F.2d 1114 (4th Cir. 1978), for example, the Fourth Circuit considered a *habeas corpus* appeal from the adverse decision of a newly-appointed district judge who had also acted adversely on the case while sitting as a justice of his state's supreme court. The judge had no memory of having heard the case as a state jurist, and the appellate panel expressed its complete confidence in his impartiality. Still, the Fourth Circuit ordered his recusal, in words applicable here:

> Judge Haden's prior participation in the case, of course, was entirely judicial and not personal, but as a district judge he was reviewing the federal constitutional validity of what he previously had approved as a member of the Supreme Court of West Virginia. In that situation, there is a basis for a reasonable person to form a reasonable basis for questioning his impartiality and his capacity to provide the independent federal review that is requisite."

*Id.* at 1118. *Accord, Russell v. Lane*, 890 F.2d 947 (7th Cir. 1989); *Clemmons v. Wolfe*, 377 F.3d 322, (3rd Cir. 2004); *See also, McKinney v. Att'y Gen'l*, 225 F.3d 654 (table), 2000 WL 966040 (text) (4th Cir. 2000) (where judge earlier sat as juror). In *United States v. Columbia Broadcasting System, Inc.*, 497 F.2d 107 (5th Cir. 1974), a district judge was required to recuse himself from a criminal contempt proceeding arising out of alleged violation of his own order, on the ground that a judge has an interest in the enforcement of his own orders and may not "pass on the clarity of his own orders." Id., at 109.

. . . . These decisions exemplify the judiciary's laudable instinct not only to do justice, but to been seen to be doing justice. Consider the court in *Limeco, Inc. v. Division of Lime*, 571 F.Supp. 710 (D.C.Miss. 1983). This case deals with the regulation of limes. Some forty-one years earlier, the assigned judge had served in the state legislature, where he had voted on a bill

relating to the establishment and activities of the defendant department. He had no recollection of the vote, and the opinion does not reveal connection between the issue before the legislature and the issue before the court. Yet the mere fact that the judge had taken a position on matters relating to one of the parties was sufficient to require recusal. Judicial decisions like this exemplify the commitment of federal courts to the principles informing 28 U.S.C. Sec.455(a).

    C.    Judge Loken Has an Institutional Interest in
The Adjudication of the Instant Case Which
Should Bar Him From Acting as Adjudicator.

The prospect of Judge Loken's adjudicating the merits of a claim implicating the constitutionality of his own actions is not the only impediment to this court's hearing this case. Given Judge Loken's and the Eighth Circuit's reported practices regarding appellate fees, the plaintiff lawyers respectfully submit that Judge Loken has an institutional interest in the determination of this case that, fairly assessed, precludes him from sitting in judgment here. As Chief Judge of the Eighth Circuit, Judge Loken should not adjudicate a case which calls into question administrative practices adhered to by that court, especially at a time when he serves as Chief Judge, and therefore chief administrative officer, of that court..

It is settled law that a judge associated with an institution that has a strong interest in a case must recuse himself under 28 U.S.C. § 455(a). *See, Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, (1988) (decision reversed where judge, trustee of university having interest in transaction with party in underlying suit, failed to recuse himself). *See also, United States v. Sartori*, 560 F.Supp. 427 (D.Md. 1983), *aff'd* 730 F.2d 973 (4th Cir. 1984) (judge, prominent member of American Cancer Society, recuses self from prosecution of purveyor of unproven

cancer treatment due to institutional interests of the Society). These cases apply with special urgency when the judge is not only associated with the institution whose policies are being challenged but is the chief administrative officer of that institution, responsible for the implementation of those very policies.

The plaintiff lawyers respectfully submit that Judge Loken's institutional interests relative to the past and future administrative operations of the Eighth Circuit disqualify him as an appropriate adjudicator of their claims against the Chief Judge of the Fourth Circuit on the matters at issue.

Conclusion

For the reasons given above, the plaintiff lawyers' ask Judge Loken to grant their motion asking that he recuse himself from participation in this action.

In the event that Judge Loken grants this motion, then the plaintiff lawyers request, with respect, that the appropriate judicial authorities assign this case to a judge who has either not awarded fees under the Criminal Justice Act for work before a court of appeals at all, such as a district judge, or to a judge who has not awarded such fees under a plan which follows the pattern of the plan challenged by the plaintiff lawyers in this litigation

Respectfully submitted,

STEVEN ROSENFIELD, *et al.*,

By Counsel

Dated: September ___, 2006

Counsel for Plaintiffs:


/s/ Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100
(703) 684-1104 (fax)
vmg@robinhoodesq.com

Rosenfield\Pleadings\MemRecuse

Rebecca K. Glenberg, #44099
American Civil Liberties Union of Virginia Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, VA 23219
(804) 644-8080
(804) 649-2733 (fax)
rglenberg@acluva.org

Steven D. Rosenfield, #16539
913 E. Jefferson Street
Charlottesville, VA 22902
(434) 984-0300
(434) 220-4852 (fax)
attyrosen@aol.com

Edward M. Wayland, #17380
P.O. Box 17
Montgomery, AL 36101
(334) 834-9901
(334) 264-8742 (fax)
edwayland@yahoo.com

Certificate of Service

I Victor M. Glasberg, hereby certify that on September __, 2006, I electronically filed the foregoing Memorandum In Support of Plaintiff's Motion for Recusal with the clerk of the court using the CM/ECF system which will send information of such filing to the following:

        John L. Brownlee, U.S. Attorney
        Thomas L. Eckert, Assistant U.S. Attorney
        P.O. Box 1709
        Roanoke, VA 24008
        Counsel for Defendant

                                          s/ Victor M. Glasberg